Filed 9/19/13  In re E.T. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re E.T., et al, Persons Coming Under the Juvenile Court Law. | D063962 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. JENNIFER T., Defendant and Appellant. | (Super. Ct. No. J518643A-B) |

APPEAL from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Caitlin E. Rae, Deputy County Counsel, for Plaintiff and Respondent.

Jennifer T. appeals juvenile court jurisdictional and dispositional orders concerning her children, E.T. and R.T. She contends the court erred by removing the children from her care, and it abused its discretion and violated her due process rights when it limited her right to direct the children's education. We grant the motion by the San Diego County Health and Human Services Agency (the Agency) to augment the record with the juvenile court minute order of August 15, 2013, which shows the court has reinstated Jennifer's educational rights. We thus conclude this issue is moot. As to the other matters Jennifer raises, we hold substantial evidence supports the orders removing the children from her custody, and she has not shown a denial of due process. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

On March 12, 2013, the Agency petitioned on behalf of six-year-old E.T. and two-year-old R.T. under Welfare and Institutions Code section 300, subdivision (b), alleging the children were at substantial risk because Jennifer left them unattended and unsupervised from March 7 until March 10, during which time she was arrested and then transferred to a psychiatric hospital. (Statutory references are to the Welfare and Institutions Code.) The petitions also alleged Jennifer was mentally ill. The court ordered the children detained and ordered Jennifer would have supervised visitation.

On March 7 at 6:50 a.m., police arrested Jennifer when her taxi driver said she refused to pay her taxi fare. The officers reported Jennifer appeared disoriented, had a blank stare and made bizarre comments. At the jail and at the psychiatric hospital she was uncooperative and aggressive and spoke in gibberish. She refused to take medication

2

and was resistant to treatment. On March 10, Jennifer told hospital staff she did not know who was taking care of her children. When police went to the home to investigate, they found E.T. and R.T. there alone. E.T. said she did not know how long they had been there, but she had been fixing food and taking care of R.T.

The maternal grandmother said Jennifer had moved from New York to California to start her own business. The grandmother had come to San Diego in February 2013 to help her, but Jennifer seemed agitated and delusional and talked about connecting with her late husband, who had committed suicide three years earlier. One night, after an argument, Jennifer told the grandmother to leave. When the grandparents returned to San Diego after the children were detained, Jennifer followed them in her car and accused them of trying to take the children.

At a visit on March 22, Jennifer attempted to take the children with her. She called police and said her bodyguard was there to protect her. When the police officer showed her documentation indicating the children were being detained and her visits supervised, she apologized to E.T. and said she would take her home on the next Monday.

The social worker stated Jennifer appeared calmer when he met with her in late April. Jennifer said that on the evening before her arrest, she had put the children to bed and then remembered she had left something she needed at her new business. She left a note for a neighbor who had babysat for the children in the past, and later yelled to the neighbor that she was leaving and asking her to watch the children for 30 minutes. She said her car got stuck several miles from home and she hailed a taxi. When she arrived at

3

her apartment, the driver would not allow her to go inside for money to pay the fare, but locked the doors and drove to the police station.

Jennifer's neighbor said she had stopped babysitting the children for Jennifer because Jennifer was unpredictable. Jennifer owed her money, accused her of making a referral to the Agency and threatened her. She described how Jennifer had played loud music and acted erratically the night before the incident that resulted in her arrest and hospitalization.

At the jurisdictional/dispositional hearing Jennifer testified she had been studying to become a holistic health practitioner. She said after her husband died she had been in therapy, but there had been no concerns about her mental health. She had been working long hours in preparation of opening up her business, and on the night she left the children, she believed her neighbors had agreed to watch them although they had not had a specific conversation about it. She said she told the police officer who arrested her and staff at the jail and the psychiatric hospital that she had children at home, but they did not listen. She testified she believed she had the right to take her children home on the day she attempted to remove them from the visitation center.

After considering the evidence and argument by counsel, the court found the allegations of the petitions to be true as amended. The court removed custody from Jennifer and suspended her educational rights.

4

Jennifer contends the court erred by removing the children from her custody. She argues the evidence was insufficient to show they were at a risk of harm in her care, a single incident led to their dependencies, and by the time of the disposition hearing she was able to care for them.

A reviewing court must uphold a juvenile court's findings and orders if they are supported by substantial evidence. (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1036-1037.) "[W]e must indulge in all reasonable inferences to support the findings of the juvenile court [citation], and we must also ' . . . view the record in the light most favorable to the orders of the juvenile court.' " (*In re Luwanna S.* (1973) 31 Cal.App.3d 112, 114.) The appellant bears the burden to show the evidence is insufficient to support the court's findings. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

Section 361, subdivision (c)(1) provides a child may not be taken from the custody of his or her parents unless the juvenile court finds by clear and convincing evidence:

> "There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

"The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.) The focus of the

dependency statutes is to prevent harm to the child. (*In re Jamie M*. (1982) 134 Cal.App.3d 530, 536.)

Jennifer has not shown error. Her behavior leading up to the incident which resulted in the children being detained and her actions in the weeks after that time showed the children would be at substantial risk in her care. The grandmother said that she had been concerned about Jennifer. She said Jennifer's behavior had been "off" during the two weeks she stayed with her to help care for the children. Jennifer seemed delusional and everything irritated her. Her neighbor described Jennifer as unpredictable. While she was in the psychiatric hospital, she smeared food, talked in gibberish, and was agitated, psychotic, delusional and paranoid. The psychiatrist diagnosed her with "Psychosis Not Otherwise Specified, Rule out Paranoid Schizophrenia, and Bipolar Disorder."

After Jennifer was released from the psychiatric hospital, she told the social worker she was a psychiatrist, and staff at the hospital should have recognized this. She brought a "bodyguard" to protect her at a visit with the children, attempted to take them from the visitation facility, swore and told the children to spit on the floor. She accused the grandparents of trying to steal the children and followed them in a car while videotaping and screaming at them.

Even though Jennifer was calmer and more rational by the time of the hearing, she never took responsibility for leaving the children alone, but blamed the police officer, the taxi driver and staff at the mental health facility. She had not yet engaged in therapy, did not have any local support and had been evicted from her apartment. Although she

6

appeared to be gaining some insight, she continued to be aggressive and impulsive. Substantial evidence supports the order removing the children from Jennifer's custody.

## DISPOSITION

The orders are affirmed.

McINTYRE, J.

WE CONCUR:

McDONALD, J.

AARON, J.